UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
THE NEW YORK TIMES COMPANY and
MARIA SACCHETTI,

            Plaintiffs,

- against -

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

            Defendant.
------------------------------------------------------X

**OPINION AND ORDER**

12 Civ. 8100 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

In *Zadvydas v. Davis*, the Supreme Court held that individuals who have been found unlawfully present in the United States and are scheduled for removal may not be detained for a period longer than six months where there is no significant likelihood of removal in the reasonably foreseeable future.[1] The New York Times Co. and its employee Maria Sacchetti, a reporter for the Boston Globe, (collectively "Plaintiffs") request, pursuant to the Freedom of Information Act ("FOIA"),[2] that the United States Department of Homeland Security ("DHS")

---

[1] 533 U.S. 678, 701 (2001).

[2] 5 U.S.C. § 552 *et seq.*

1

produce a list of all aliens since 2008 who, after being convicted of a crime and serving their sentence, were designated for removal but were released from DHS custody pursuant to *Zadvydas*. In response to this request DHS produced a list of 6,843 individuals (the "Released Individuals") along with certain relevant information, but redacted the individuals' names pursuant to FOIA Exemptions 6 and 7(C) concerning protection of privacy interests. The parties now cross-move for summary judgment on the propriety of DHS's decision to withhold the names of the individuals.

## II.   STATEMENT OF FACTS

When an alien is designated for removal from the United States, DHS, and specifically Immigrations and Customs Enforcement ("ICE"), generally places the individual in administrative detention until removal is effected.[3] During that period, an ICE officer works to obtain necessary travel documents from the individual's home country.[4] Occasionally ICE is unable to obtain the necessary documents, for example because of the state of U.S. diplomatic relations with the country or the individual's medical condition.[5] If ICE's efforts to obtain the

---

[3] *See* 8 U.S.C. § 1231; Declaration of Ryan Law in Support of Defendant's Motion for Summary Judgment ("Law Decl.") ¶ 7.

[4] *See* Law Decl. ¶ 8.

[5] *See id.* ¶ 9.

necessary documentation exceed six months without the likelihood of success in the foreseeable future, *Zadvydas* mandates that the individual be released unless special circumstances exist, *i.e.*, risk of flight or danger to the community.[6]

As part of a journalistic investigation into the government's handling of immigration matters, Sacchetti researched the government's procedures and policies for releasing aliens convicted of crimes who were designated for removal to their home country, but whose administrative detention implicated the Supreme Court's ruling in *Zadvydas*.[7] Sacchetti was interested in learning whether, for instance, "aliens with a history of violent crimes were being released, whether repeat offenders were being released on more than one occasion, and whether sentencing decisions that had been affected by the court's belief that removal would follow were being undermined by release."[8]

Sacchetti submitted a FOIA request to ICE on September 28, 2011,

---

[6] *Zadvydas*, 533 U.S. at 691.

[7] *See* Declaration of Maria Sacchetti ("Sacchetti Decl.") ¶¶ 2-6.

[8] Plaintiffs' Memorandum of Law in Support of Their Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 3 (citing Sacchetti Decl. ¶¶ 4, 5, 9, 12). Sacchetti's research revealed that in some cases courts, as well as victims, were told at sentencing that the defendant would be removed following release, but in fact the defendant was not removed and the perpetrators victimized those who testified against them. *See* Sacchetti Decl. ¶¶ 5, 11-15.

which was subsequently modified into a request seeking "a list of convicted criminal aliens released by ICE, but not deported, since 1/1/2008 due to the 2001 Supreme Court decision in *Zadvydas*[]" (the "Request").[9] DHS produced a spreadsheet (the "Spreadsheet") containing, for each individual, the most serious crime for which the individual was convicted, the date of release from ICE custody, and the jurisdiction in which the release took place (the "Area of Responsibility").[10] The names of the individuals were redacted based on DHS's aassertion that the information fell within FOIA Exemptions 6 and 7(C).[11] On February 24, 2012, Sacchetti administratively appealed the redaction of the names;[12] on April 20, 2012, DHS denied the appeal on the grounds that the Exemptions applied;[13] and on November 7, 2012 Plaintiffs initiated this lawsuit.

### III. APPLICABLE LAW AND STANDARD

Balancing the objective of "broad disclosure of Government records" against recognition that such disclosure "may not always be in the public

---

[9] *See* Ex. B to Law Decl.

[10] *See* Ex. C to Law Decl.

[11] *See id.*; Complaint ¶ 11.

[12] *See* Ex. D to Law Decl.

[13] *See* Ex. E to Law Decl.

interest,"[14] FOIA provides for nine exemptions from disclosure, which are to be construed narrowly, with all doubts resolved in favor of disclosure.[15] Courts review de novo the adequacy of an agency's justifications for withholding information pursuant to an exemption.[16]

FOIA cases are generally resolved on motions for summary judgment,[17] which requires that the moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[18] The agency withholding documents or redacting information responsive to a FOIA request bears the burden of proving the applicability of claimed exemptions.[19] "Summary judgment is appropriate where the agency [submits] affidavits [that] 'describe the justifications for nondisclosure with

---

[14] *CIA v. Sims*, 471 U.S. 159, 166 (1985); *American Civil Liberties Union v. United States Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) ("*ACLU v. DOJ*").

[15] *See* 5 U.S.C. § 552(b); *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989); *Associated Press v. United States Dep't of Defense*, 554 F.3d 274, 283-84 (2d Cir. 2009).

[16] *See* 5 U.S.C. § 552(a)(4)(B); *ACLU v. DOJ*, 681 F.3d at 69.

[17] *See New York Times Co. v. United States Dep't of Justice*, No. 11 Civ. 9336, 2013 WL 50209, at *15 (S.D.N.Y. Jan. 3, 2013) (compiling cases).

[18] Fed. R. Civ. P. 56(c).

[19] *See United States Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *Assoc. Press*, 554 F. 3d at 283.

reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"[20]  An agency's affidavits are viewed with a presumption of good faith.[21]

ICE withheld the names of the Released Individuals pursuant to FOIA Exemptions 6 and 7(C).  Exemption 6 exempts from disclosure information from "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[22]  Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes" where disclosing them "could reasonably be expected to constitute an unwarranted invasion of personal privacy."[23]  Because these records are more closely aligned with Exemption 7(C), which has a lower threshold for what

---

[20]   *ACLU v. DOJ*, 681 F.3d at 69 (quoting *Wilner v. National Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009)).

[21]   *See Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005).  This presumption of good faith, however, does not abrogate the court's duty to undertake de novo review of the agency's decision.  *See Wilner*, 592 F.3d at 69, 73.

[22]   5 U.S.C. § 552(b)(6).  ICE argues that the records at issue constitute "similar files" within the meaning of Exemption 6 as that phrase encompasses "'records on an individual which can be identified as applying to that individual.'"  Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Mem.") at 5 n.3 (quoting *Assoc. Press*, 554 F.3d at 291).

[23]   5 U.S.C. § 552(b)(7)(C).

invasion of privacy will trigger the exemption, I assess DHS's exemption claims under 7(C).[24]  When applying Exemption 7(C), courts engage in a two-part test. First, the court determines "whether there is any privacy interest in the information sought."[25]  If the court answers that question in the affirmative, it then balances the privacy interest against the public interest in disclosure.[26]  "Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to [show: (1)] that the public interest sought to be advanced is a significant one [; and (2) that] the information is likely to advance that interest."[27]

## IV.   DISCUSSION

---

[24]   *See United States Dep't of Defense v. FLRA*, 510 U.S. 487, 496-97 n.6 (1994) (Exemption 7(C) "is more protective of privacy than Exemption 6" because the former "applies to any disclosure that could reasonably be expected to constitute an invasion of privacy that is unwarranted").  *See also Assoc. Press*, 554 F.3d at 290-91 ("Because we find that Exemption 7(C) applies to the redactions of detainees' identifying information, we do not need to address the applicability of Exemption 6.").

[25]   *Assoc. Press*, 554 F.3d at 284.

[26]   *See id.* at 285.  *See also FLRA v. United States Dep't of Veterans*, 958 F.2d 503, 509 (2d Cir. 1992) ("Only where a privacy interest is implicated does the public interest for which the information will serve become relevant and require a balancing of the competing interests.").

[27]   *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

### A. Disclosure of the Names of Released Individuals Implicates a Privacy Interest

It is well-established that an individual has a privacy interest in controlling information concerning his or her person, where release of that information may cause "embarrassment in their social and community relationships," or result in "retaliatory action."[28]  At the same time, such privacy interest may be limited or eliminated entirely where the information at issue is already public, or where the individual has forfeited the right to control the relevant information no matter how potentially harmful.[29]

DHS argues that "[t]he Released Individuals have a strong interest in avoiding any embarrassment or retaliation that may be caused by the Government's publicly identifying them both as convicted criminals and illegal aliens."[30]  Plaintiffs respond that "[a]ny criminal information about the individuals – specifically, their arrests, convictions, and sentences – is a matter of public record, and information regarding their immigration status is routinely disclosed in

---

[28]  *Ray*, 502 U.S. at 176-77.

[29]  *See Center for Nat'l Sec. Studies v. United States Dep't of Justice*, 331 F.3d 918, 945-46 (D.C. Cir. 2003) (Tatel, J., dissenting) ("Even though being arrested subjects a person suspected of criminal activity to embarrassment and potentially more serious reputational harm, the law is nevertheless clear that no right of privacy is violated by the disclosure of an official act such as an arrest.").

[30]  Def. Mem. at 7.

those public proceedings as well."[31]  As such, disclosure would simply "make public what is already a matter of public record" with the sole new information being that the individual has not been removed from the United States.[32]

The Supreme Court has confirmed that there is a privacy interest in not publicizing as "federal compilations" events such as "arrests, charges, convictions, and incarcerations," even those which "have been previously disclosed to the public."[33]  The Court recognized that there is a significant difference, in terms of privacy interests, "between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole."[34]  Here too, there is a difference between the "practical obscurity"[35] of the existence of public records regarding individuals' prior convictions, and records regarding

---

[31]   Pl. Mem. at 9.

[32]   *Id.*

[33]   *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762-63 (1989).  *Accord American Civil Liberties Union v. United States Dep't of Justice*, 655 F.3d 1, 8 (D.C. Cir. 2011) ("The Court [in *Reporters Comm.*] held 'as a categorical matter' that 'a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy,' and that such records may therefore not be disclosed in the absence of a cognizable public interest.").

[34]   *Reporters Comm.*, 489 U.S. at 764.  *Accord id.* at 753 ("Although much rap-sheet information is a matter of public record, the availability and dissemination of the actual rap sheet to the public is limited.").

[35]   *Id.* at 762.

immigration status, which may be obtained with some effort, and the release of a spreadsheet compiled by ICE containing a variety of information about an individual including criminal convictions, status as an illegal immigrant, some information about that individual's current location,[36] and the fact that he or she has not been deported.[37]

### B. The Public Interest in Disclosure Outweighs the Privacy Interests

Having concluded that there is a privacy interest, albeit a diminished one, in the information contained in the Releasee Spreadsheet, the Court must weigh that privacy interest against the public interest in disclosure.[38] There is "only one relevant public interest, that of 'open[ing] agency action to the light of

---

[36] "The only remotely geographical information provided on the Releasee Spreadsheet is the administratively created Area of Responsibility, each of which covers a large geographical area[], often several states." Pl. Mem. at 9. In fact, most Areas of Responsibility appear to be metropolitan areas.

[37] *See Reporters Comm.*, 489 U.S. at 764 ("The very fact that federal funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the summaries would not otherwise be 'freely available' either to the officials who have access to the underlying files or to the general public. Indeed, if the summaries were 'freely available,' there would be no reason to invoke the FOIA to obtain access to the information they contain.").

[38] *See Favish*, 541 U.S. at 172 ("Where the privacy concerns addressed by exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for disclosure."). *See also Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 193 (2d Cir. 2012).

public scrutiny.'"[39]

The public has an interest in knowing how ICE handles aliens convicted of crimes who are required to be released pursuant to *Zadvydas* when their detention period exceeds six months. This is "[o]fficial information that sheds light on an agency's performance of its statutory duties."[40] The Spreadsheet captures relevant information about how ICE is handling its obligations under *Zadvydas* – for example, the most significant crime committed permits evaluation of whether a special circumstance such as threat to safety might have warranted an exception to the six month limitation period. The question, then, is whether inclusion of the names of the releasees would shed additional light on agency practices and whether that additional light justifies the concomitant invasion of privacy.[41]

---

[39] *Assoc. Press*, 554 F.3d at 288 (quoting *Reporters Comm.*, 489 U.S. at 772) (alterations in original).

[40] *Reporters Comm.*, 489 U.S. at 773 (holding that such information "falls squarely within [FOIA's] statutory purpose").

[41] *See Buffalo Evening News, Inc. v. United States Border Patrol*, 791 F. Supp. 386, 400 (W.D.N.Y. 1992) (agreeing "that disclosure of the statutory basis for excluding a certain alien based on ideological grounds, combined with disclosure of the alien's occupation and country of origin, enables the public to assess much about the government's practice and policy toward ideological exclusion" but finding that in that case "disclosure of the purely personal information redacted pursuant to Exemption 7(C) would not shed much light on agency practice to any degree sufficient to outweigh the strong privacy interests

Plaintiffs do not assert a direct public interest in knowing the names of individuals being released pursuant to *Zadvydas*. Rather, they argue that disclosure of the names of the Released Individuals would permit them to obtain information that "would shed further light on critical aspects of the government's handling of its removal duties."[42] Plaintiffs contend that "the Globe could more fully *monitor* how often courts gave lesser sentences to aliens because prosecutors and judges mistakenly believed that removal was to follow sentence [and] how often DHS failed to seek longer detentions for individuals who, according to court records, posed a risk to the community."[43] In support of this, Plaintiffs cite examples of where Sacchetti was able to learn through "diligent reporting despite the secrecy imposed by DHS" of several questionable exercises of DHS's discretion under *Zadvydas*.[44]

---

involved").

[42]    Pl. Mem. at 15. *Accord* Compl. ¶ 15 (learning names of Released Individuals would allow plaintiffs to learn "whether [ICE] is making considered judgments as to whether a convicted alien is likely to commit a crime again").

[43]    Pl. Mem. at 15-16 (emphasis added).

[44]    Examples of what Sacchetti's research uncovered include: DHS released McCarthy Larngar shortly after ICE declared in writing that he was a danger to the community, after which he committed another crime and returned to jail; DHS released Huang Chen without warning a prior victim, and he eventually stalked and killed that victim; Antonio Rodrigues was released after obtaining a reduced criminal sentence based on expected deportation and now faces new

The Second Circuit has observed that "assertions of a public interest in 'monitoring' governmental operations 'have not been viewed favorably by the courts,'" but accepted this interest as "within the ambit of public interests."[45] In *Associated Press*, which involved requests for information about Guantamo Bay detainees, the Second Circuit found a similar argument – "that the names and identifying information would allow the public to track these detainees' treatment . . . including transfer and release decisions" – plausible but ultimately insufficient in light of the privacy interests in question.[46] The court also separately considered the "derivative use" theory – that is "that the public interest can be read more broadly to include the ability to use redacted information to obtain additional as yet undiscovered information outside the government files."[47] Recognizing that the

---

charges of shooting a man between the eyes.  *See* Pl. Mem. at 15.

    [45]    *Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 88 (2d Cir. 1991) (quoting *Heights Cmty Cong. v. Veterans Admin.*, 732 F.2d 526, 530 (6th Cir. 1983)).

    [46]    *Assoc. Press*, 554 F.3d at 289-90 (holding that "the speculative nature of the result is insufficient to outweigh the detainees' privacy interest in non-disclosure").

    [47]    *Id.* (citations omitted) (discussing *Ray*, 502 U.S. at 177, wherein "the FOIA requester argued that the public interest would be served by disclosure of the Haitian returnees' names because that information would allow the public to conduct its own interviews of the returnees to see if they corroborated the information in the State Department's interview transcripts").

Supreme Court left open "'whether a derivative use theory would ever justify release of information about private individuals,'" the court found a derivative use theory insufficient in *Associated Press* but declined to foreclose the theory altogether.[48]

The privacy interest at issue in this case – that of convicted criminals in not releasing in compiled form information which is already public – is significantly diminished compared to those at issue in *Associated Press* (Guantanamo Bay detainees)[49] or *Ray* ("Haitian nationals who had attempted to emigrate illegally to the United States and were involuntarily returned to Haiti").[50] Although release of the names in this case would not "reveal[] something *directly* about the character of a government agency,"[51] plaintiffs do not propose to contact the individuals in furtherance of their investigation – a derivative use which the Second Circuit held "dramatically increases the already significant threat to the [] privacy interests that disclosure of this information would entail."[52]  Rather,

---

[48] *Id.* at 290 (quoting *Ray*, 502 U.S. at 179).

[49] *See id.* at 280.

[50] 502 U.S. at 166.

[51] *Hopkins*, 929 F.2d at 88 (emphasis in original) (citing *Reporters Comm.*, 489 U.S. at 774).

[52] *Id.* Of course there is always the possibility that, if the individual names are disclosed, Plaintiffs or someone other than Plaintiffs could contact the

plaintiffs argue that disclosure of individual names would permit "monitoring of whether repeat offenders are on the list" and "identif[ication] through public court document [of] those countries with a track record of avoiding or resisting repatriations."[53]

Plaintiffs have established that they would use the individual names in combination with other public information to draw conclusions about the performance of the DHS – information which the government agency, for whatever reason, is disinclined to disclose on its own.[54] They have refuted DHS's contention that allegations of impropriety by government actors are based on "bare

---

individuals personally. However, that is always a possibility when information is disclosed – the inquiry is whether the *stated* purpose of the FOIA request justifies the possible intrusion on privacy. Moreover, because these records are already public, it is already possible, albeit more difficult, to contact the Released Individuals, as Sacchetti's reporting proves. The requested disclosure would not release additional information that would facilitate personal intrusions because unlike in *Hopkins*, the individuals' addresses are not the subject of a disclosure request. *See* 929 F.2d at 88 (declining to release individual names *and* addresses).

[53]   Pl. Mem. at 16.

[54]   There is merit in plaintiffs' argument that DHS cannot dismiss the value of the Globe's inquiry by asserting that the troubling cases "do not indicate any failing on the part of the agency" but refuse to provide the data that would refute the Globe's suspicions about the practices pursuant to *Zadvydas*. *See* Pl. Mem. at 16 (quoting Def. Mem. at 9-10). *See also id.* at 17 ("DHS cannot have it both ways: It cannot keep secret the very information that would [directly] answer a dispositive question in this case and then criticize the Globe for failing to scale the wall of secrecy that DHS itself has built.").

suspicion,"[55] and have established that disclosure of the names would further the legitimate public interest in knowing how government agencies make decisions. Thus, DHS has not carried its burden of showing that this diminished privacy interest outweighs the public interest in "facilitat[ing] an investigation of [DHS's] performance."[56]

## V.   CONCLUSION

For the foregoing reasons, summary judgment is granted in Plaintiffs' favor and DHS is ordered to disclose the names of the Released Individuals. The Clerk of the Court is directed to close these motions (Docket Nos. 4 and 7) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          June 13, 2013

---

[55]   *Favish*, 541 U.S. at 174.

[56]   *Hopkins*, 929 F.2d at 88.

## - Appearances -

**For Plaintiffs:**

David Edward McCraw, Esq.
Stephen Nathaniel Gikow, Esq.
The New York Times Company
620 Eighth Avenue
New York, NY 10018
(212) 556-4031

**For Defendants:**

Cristine Irvin Phillips
Assistant U.S. Attorney
United States Attorney Office, SDNY
86 Chambers Street
New York, NY 10007
(212) 637-2696